STATE v. FRED A. PERLEY AND W. R. CROCKETT.

(Filed 23 May, 1917.)

1. **Constitutional Law—Statutes—Police Powers—Municipal Corporations—Watersheds.**

   Chapter 56, Laws 1913, requiring the owners of land ·to remove tree-tops, boughs and laps, etc., within 400 feet of the boundary line of a municipal watershed, left from cutting timber thereon, "so as to prevent the spread of fire from such cut-over area and the consequent damage to such watershed," making its violation a misdemeanor, falls within the police powers of the State, within its legislative discretion, and not within the inhibition of the XIVth amendment to the Federal Constitution as to due process of law and a denial of the equal protection of the law.

2. **Statutes—Police Powers—Relative Rights.**

   A citizen deriving title to real property from the State acquires it upon condition that he holds it subject to necessary or reasonable regulations in promotion of the public interest, the rights, duties, and advantages of each being reciprocal with those of adjoining owners of lands, and beneficial to all.

3. **Criminal Law—Statutes—Intent—Municipal Corporations—Watersheds.**

   The intent to violate a criminal statute is the criminal intent punishable by its terms; and where the intent to violate our statute making it a misdemeanor to leave the tree-tops, etc., within 400 feet from a municipal watershed, etc., is shown, the defendant, having violated it, may not avoid the consequences of his act by showing that his motive was not a bad one.

4. **Constitutional Law—Statutes—Interpretation.**

   A statute will not be declared unconstitutional by the courts unless it clearly appears to be in conflict with the organic law, and such conclusion is unavoidable after removing every reasonable doubt as to its incompatibility with the Constitution.

5. **Statutes—Municipal Corporations—Watersheds—Timber Interests.**

   One having logging interests upon lands is amenable to the provision of our statute requiring the removal of the tree-tops, etc., from the cutting-over of the land within 400 feet of a municipal watershed affording the means of a water supply to its inhabitants.

INDICTMENT tried before *Adams, J.,* and a jury, at April Term, 1917, of BUNCOMBE.

Defendants were indicted for a violation of Public Laws 1913, ch. 56, by cutting down timber on lands of another, and leaving thereon the tree-tops, boughs, laps, and other portions of timber not fit for commercial purposes within 400 feet of the boundary line of the watershed of the Asheville water-works plant owned by said city and used as a public supply for its citizens. Defendants were duly notified, more than three

months before indictment found, to remove the same, and failed and re-
fused to do so. The requirement of the law was declared to be for the
prevention of the spread of fire from the timber lands to the watershed,
and its injury from the destruction of timber growing therein. There
was a motion to quash, which was overruled, and a special verdict. The
defense was that the statute is contrary to the fourteenth amendment
to the Constitution of the United States, as it deprives the defendants
of their property without due process of law, and denies to them the
equal protection of the law. There was no denial that the prohibited
acts were committed, but the defendants alleged that the statute is void,
and that they are, by the peculiar facts, exempt from its provisions.
The special verdict found "that on 1 July, 1916, the city of Asheville,
a municipal corporation, did own a certain large boundary of land,
situated in the county of Buncombe and State of North Carolina, which
said boundary of land consists of about 16,000 acres, the outside
boundary of which is about 12 miles in length; that on 1 July, 1916,
prior thereto, and since that time, the said city of Asheville held and
used said property as a watershed, from which it derived water which
was furnished to the inhabitants of the city of Asheville, North Caro-
lina, for domestic and other purposes, which said property was known
as the city watershed. That the defendants Fred A. Perley and W. H.
Crockett, on or about 1 July, 1916, were owners of standing and fallen
timber on certain lands situated in Yancey County North Carolina,
which said lands lie within 400 feet of the said watershed belonging to
the city of Asheville, and adjoining said watershed on the north about
4 miles, but did not own the land on which said timber stood, and that
water did not drain from said timber, or the land on which it stood, on
to said watershed; that said watershed extends to the north to the top
of ridges and mountains on one side, and the timber owned by the
defendants, which was cut as herein found, stood on land extending to
the south which reached the tops of the ridges and mountains on the
opposite side, and that said lands and timber were in all respects sub-
stantially similar on both sides of the line of said city watershed, both
within and without."

The court not agreeing with the defendants in their contention, the
jury in submission to its opinion found the defendants guilty on the
special verdict, and from the judgment of the court thereon they
appealed.

*Attorney-General Manning, Assistant Attorney-General Sykes, J. E.
Swain, and Marcus Erwin for the State.*
*Martin, Rollins & Wright for defendants.*

WALKER, J., after stating the case: The possession and enjoyment of all rights are subject to such reasonable conditions and regulations as may be deemed by the Legislature essential to the public welfare, and especially are they held in subordination to the exercise of the police power, which extends and relates to the preservation of the peace, good order, safety, health, morals, convenience and comfort of the people. It is not confined to the suppression of what is offensive, disorderly, or unsanitary, but embraces those rules and regulations designed to pro-mote the public good and general prosperity of the community, provided that the legislation of whatever kind has a real or substantial relation to those objects, and is not a palpable invasion of individual rights secured by the fundamental law. In its broadest sense, as sometimes defined, it includes nearly all legislation and almost every function of civil government. *New York v. Miln,* 11 Peters (U. S.), 102; *Barbier v. Connelly,* 113 U. S., 27; *L. and N. R. R. v. Kentucky,* 161 U. S., 677; *Lockner v. New York,* 198 U. S., 45; *Lawton v. Steele,* 152 U. S., 133; *Hennington v. Georgia,* 163 U. S., 299; *Bacon v. Walker,* 204 U. S., 311.

It is held that this power is not subject to any definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. *Canfield v. U. S.,* 167 U. S., 518. The fourteenth amendment to the Federal Constitution does not restrict the subjects upon which the police power may be lawfully exerted. *Jones v. Brim,* 165 U. S., 180. In *Lockner v. New York, supra, Justice Peckham* said of it: "There are, however, certain powers, existing in the sovereignty of each State in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals, and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the State in the exercise of those powers, and with such conditions the fourteenth amendment was not designed to interfere," citing *Mugler v. Kansas,* 123 U. S., 623, and other cases. The regulation of the use of land comes within the scope of the police power. Tiedeman on Limitations of Police Powers, sec. 122, says at page 423: "It is not every use which comes within this constitutional protection. One has a vested right to only a reasonable use of one's lands. It is not difficult to find the rule which determines the limitations upon ways or manner of using lands. It is the rule which furnishes the solution of every problem in the law of police powers, and which is comprehended in the legal maxim, *Sic utere tuo ut alienum non lædas.* One can lawfully make use of his property only in such a manner as that he will not

injure another." We held in *Durham v. Cotton Mill,* 141 N. C., 615, (s. c. 144 N. C., 705); that the statute (Rev., sec. 3051) for the protection of streams from which the public is supplied with drinking-water, was a valid exercise of this power, and that act required the riparian owner to subject sewage on his own land to a system of purification before discharging it into such a water-course. We there said, at page 636: "The extent to which such interference with the injurious use of property may be carried is a matter exclusively for the judgment of the Legislature when not controlled by fundamental law. Nor is there anything to render such legislation objectionable because in some instances it may restrain the profitable use of private property, when such use in fact does not directly injure the public in comfort or health; for to limit such legislation to cases where actual injury has occurred would be to deprive it of its most effective force. Its design is preventive, and to be effective it must be able to restrain acts which tend to produce public injury. Many instances of such an exercise of this power can be found. The State regulates the use of property in intoxicating liquors by restraining their sale, not on the ground that each particular sale does injury, for then the sale would be prohibited, but for the reason that their unrestricted sale tends to injure the public morals and comfort. The State is not bound to wait until contagion is communicated from a hospital established in the heart of a city; it may prohibit the establishment of such a hospital there, because it is likely to spread contagion." The question has undergone discussion in *Daniels v. Homer,* 139 N. C., 219; *S. v. R. R.,* 169 N. C., 295; *Shelby v. Power Co.,* 155 N. C., 196; *Skinner v. Thomas,* 171 N. C., 98; and more recently in *State Board of Health v. Comrs., ante,* where is was held: "Even vested rights having reference to the ordinary incidents of ownership must yield to reasonable interference in the exercise of police power. In that field, as stated, the judgment of the Legislature is to a great extent decisive, and must be upheld unless the statute in question has no reasonable relation to the end or purpose in view and is manifestly an arbitrary and palpable invasion of personal and private rights," citing numerous authorities. It is said in Russell on Police Powers of the State, p. 95: "Regulations to prevent fires are within the scope of the police power, as has been frequently determined. The removal of buildings for the purpose of preventing the spread of fires is authorized. Relating to this subject are laws prohibiting the keeping of explosive substances or highly inflammable substances within certain limits. The subject of building laws is also a related topic. Municipalities are very generally authorized to control the construction of buildings and to prevent the erection or maintenance of unsafe buildings. Such regulations are purely police regulations." We could multiply

examples of the kind indefinitely, in illustration of the extent to which
the courts have gone in sustaining legislation of the sort we are now
considering, where private property has been controlled and regulated
in its use for the protection of the public health and safety, and other
things so essential to the common welfare. Every citizen derives his
title to the property from the sovereign, which with, us is the State, and
he acquires it upon the implied condition that it shall be held subject
to all necessary or reasonable regulations in promotion of the public
interest. Each citizen reaps an advantage, or substantial benefit, from
the fact that all property is thus held, as the principle is a protection to
his own as well as to that of others. It enhances its value, too, because
his neighbor must so use his premises as not to injure him in the enjoy-
ment of rights pertaining to his ownership of adjacent land. The rights,
the duties, and the advantages, therefore, are all reciprocal. The en-
forcement of this law is a distinct benefit to all as much so, though not
always in the same degree, as laws enacted for our personal safety and
freedom from the annoyance of others. Private convenience must con-
sequently give way to the public good in the interest of all, and in order
that government may be administered, not for one, or even a few, but to
benefit all who have equally a claim upon its protection. In *Cusack
v. City of Chicago,* 37 Sup. Ct. Rep., 190, *Justice Clarke* said for the
Court: "The principles governing the exercise of the police power have
received such frequent application and have been so elaborated upon
in recent decisions of this Court, concluding with *Armour & Co. v.
North Dakota,* 240 U. S., 510, that further discussion of them would
not be profitable, especially in a case falling as clearly as this one does
within their scope. We, therefore, content ourselves with saying that
while this Court has refrained from any attempt to define with precision
the limits of the police power, yet its disposition is to favor the validity
of laws relating to matters completely within the territory of the State
enacting them, and it so reluctantly disagrees with the local legislative
authority, primarily the judge of the public welfare, especially when
its action is approved by the highest court of the State whose people are
directly concerned, that it will interfere with the action of such au-
thority only when it is plain and palpable that it has no real or sub-
stantial relation to the public health, safety, morals, or to the general
welfare," citing *Jacobson v. Massachusetts,* 197 U. S., 11. In the case
of *L. S. & M. So. Railway Co. v. Clough,* 37 Sup. Ct. Rep., 144, speak-
ing of the application of this law to a drainage case, *Justice Pitney*
said: "It is requiring them merely to bear the cost of constructing
crossings for their railroad lines over the proposed new channel and
outlet, 'so as not to interfere with the free use of the same,' and 'in a
sufficient manner not to unnecessarily impair its usefulness.' With

respect to this duty, if the State has a right to impose it in aid of the drainage project, the remoteness or proximity of the area to be drained is wholly immaterial." But the question we have here, upon the special facts of this case, seems to have been decided by that same high court, in *Mo. & C. R. R. Co. v. May,* 194 U. S., 267, upon facts not materially dissimilar to those in this record, and the law was upheld notwithstanding that it was confined to railroads, and was apparently discriminative with respect to that particular class. The statute of Texas which was considered in that case provided that it should be unlawful for railroad companies to permit Johnson grass, or Russian thistle, to mature and go to seed upon its right of way. The law was sustained, as the act forbidden would, if committed, be injurious to owners of contiguous land, as the grass was a menace to crops, and is propagated only by seed. The Court was divided in opinion, but all the justices concurred that the law would clearly be valid if not discriminative in its restricted application to railroads, the majority holding that it was not even discriminative. In the opinion of the Court *Justice Holmes* well said: "Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." That case was affirmed at the present term of the Court in *Chicago, etc. R. R. Co. v. Anderson,* 37 Sup. Ct. Rep., 124, where it held a statute valid which provided that all railroad corporations in Indiana should "cause all thistles, briars, docks, and other noxious weeds growing on lands occupied by them in any city, village, or township of the State, to be cut down and destroyed"; and annexed a penalty for its violation. The Court held that the statute was valid as applied in favor of contiguous landowners, stating that "as thus limited, we think its validity must be admitted under the doctrine of the *May* case."

Applying these well settled principles to the facts of this case, we do not see why this statute is not a perfectly valid exercise of the State's police power. The object in view when it was passed appears so clearly to be the protection of the forests on the watershed belonging to the city and used by it in connection with its water-works, that what was the real intention of the act is not the subject of argument. Where premises are in such condition and location that the proper maintenance of forests on them, or wooded land which is a part of them, will remove or diminish the danger of floods or landslides, the protection of the water basin, or other source of supply, from such consequences is of such great importance to the public, who use the water for domestic purposes and are dependent solely upon it, and the loss and incon-

STATE v. PERLEY.

venience from any impairment of it might be so incalcuable that it can hardly be conceived why the Legislature may not intervene by an exercise of the police power and prevent such a catastrophe. The loss to be averted would so considerably outweigh the injury resulting to the owner of contiguous lands and it would be so negligible when compared with the public damage, that the restriction imposed upon him will be disregarded as too insignificant to be set off against the great public benefit and pressing public necessity involved in the continued and proper maintenance of the watershed. It is no hardship for the landowner to clear his land of rubbish which he has made himself, and which, when it becomes dry, is so combustible in its nature as to be a standing menace to the adjacent forests. We have held that it is negligent for a railroad company to permit such inflammable matter as tree-tops, etc., to accumulate on its premises, which, if ignited, will spread fire to adjoining premises. Craft v. Timber Co., 132 N. C., 152. We have also enforced the provisions of our statute, Revisal, sec. 3346, against setting fire to woods without due notice to adjoining proprietors. Such restrictions upon the use of property have frequently been sustained by the courts, one writer stating that the books are full of such cases. Many of our municipal ordinances depend for their validity upon the existence of this power to preserve and promote the safety and welfare of the community. Considering a county ordinance requiring each landowner to rid his premises of the pesky ground-squirrel, by their extermination, which was held to be invalid because of the impossibility of executing it, the Court said, in Ex Parte Hodges, 87 Cal., 162, 165: "Such an ordinance differs materially from laws requiring an occupant of land to keep them free from noxious weeds, or such as make it the duty of an owner of diseased domestic animals to kill them in order to prevent the spread of the disease. These are matters over which the property owner has control, and the requirements are reasonable and just." See, also, Freund on Police Powers, sec. 618.

A nuisance at common law is whatever is injurious to a large class of the community, or annoys that portion of the public which necessarily comes in contact with it. Prentice on Police Powers, p. 137; 2 Wh. Cr. Law, sec. 2370. There are several different classifications of nuisances, one of which is this: "First, those which are nuisances per se, denounced as such by common law or statute; second, those which in their nature are not nuisances, but may become such by reason of locality or management; third, those which in their nature may be nuisances, but as to which there may be honest differences of opinion in impartial minds. As to the first and third, the municipal declaration is conclusive, but as to the second, the municipal power is confined to such as are nuisances in fact." Freund on Police Powers, p. 30. We

can scarcely hesitate to declare that to be a nuisance which threatens the main if not the only source of water supply to a thickly settled community, containing a large and progressive city, which has attracted many to its borders in search of pleasure, health, or prosperity, because of its many natural advantages, its salubrious climate, the beautiful scenery of its surrounding mountains, from one of which it derives its water supply, and which are covered with virgin forests and porous soil, which hold in check the heavy rains and protect the streams from sudden and violent disturbances. Recent experience has demonstrated the necessity of keeping these forests intact, and the National Government has purchased and established near there a large reservation partly for this purpose.

In the case before us the defendant, perhaps, did not intend to injure any particular persons, or to expose them to harm, but he was guilty of the criminal act in doing that which was prohibited, and which was calculated to produce injurious results, without regard to his particular intent. When a statute forbids a certain thing to be done, the intent to do the forbidden thing is the criminal intent, whether it be an immoral or evil one, *per se,* or not. Here the purpose of the law is to prevent the injury, and the gist of the crime is the effort to frustrate this intent. It is as much the duty of the State to protect the health of its citizens as it is to safeguard their lives and limbs against the acts of wrong-doers. Ethically considered, it is as culpable to endanger the safety and comfort of an entire community as it is to jeopardize the life of one of its members against whom a particular wrongful act is directed, and concededly more so. It is not the bad motive present in the mind, and which prompts the commission of the injurious act, but the doing of the act itself, that makes it indictable under the statute. Forest fires are not infrequent even in this section of the country, and they are caused generally by the dry and inflammable material lying upon the ground, and they spread with great rapidity and leave the destruction of vast areas in their wake. It was against the happening of such an event the statute was intended to provide. When such interests are involved as the safety and health of a large community, we cannot stop to speculate upon chances, or to take risks, as to what will happen, but we must keep on the safe side, so that if what would otherwise end in disaster does come, we will be prepared for it, and the public welfare will thereby be surely conserved. *Durham v. Cotton Mill, supra; Bd. of Health v. Comrs., supra.*

When a statute is assailed as unconstitutional, every presumption of validity should be indulged in its favor, and it should not be declared void except upon the clearest showing that it conflicts with the organic law. The conclusion that it is invalid should be unavoidable, and reached

STATE *v*. PERLEY.

only after removing every reasonable doubt as to its incompatibility with the Constitution. Between the two there should be an irreconcilable conflict. Therefore it is that the highest Federal Court said: "In the exercising of the police power the means to be employed to promote the public safety are primarily in the judgment of the Legislature, and the courts will not interfere with duly enacted legislation which has a substantial relation to the purpose to be accomplished, and does not arbitrarily interfere with personal and private rights." It was said in *Skinner v. Thomas, supra*: "The police power is an attribute of sovereignty, possessed by every sovereign State, and is a necessary attribute of every civilized government. 'It is the power to protect the public health and the public safety, to preserve good order and the public morals, to protect the lives and property of the citizens, the power to govern men and things by any legislation appropriate to that end.' 'Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property.' The exercise of this power is left largely to discretion of the lawmaking body, and the authority of the courts cannot be invoked unless there is an unnecessary interference with the rights of the citizen, or when there is no reasonable relation between the statute enacted and the end or purpose sought to be accomplished," citing 6 Rul. Case L., 183 and 236; 9 Enc. of U. S. Reports, 473; *Slaughterhouse cases,* 16 Wall., 36, 21 L. Ed., 394. It may be true that, let a statute be ever so charitable and the Legislature ever so generous, if the property of the subject is thus given away, or it is taken without any resultant benefit to the public, the legislation should not be countenanced; but such is not the case here. The defendant is not the owner of the soil, but had only some logging rights in the timber growing upon it. When he cut and removed the timber, it was a comparatively easy matter for him to carry off the tree-tops and other débris, or, at most, no great burden or hardship, and his failing to do so created a constant menace to the local public. If there is any reasonable doubt of it, that doubt should be resolved in favor of the latter and against him.

The question is a very important one, and we have given to it most careful consideration. It was argued before us by Mr. Martin with his usual ability and learning, which means that the case has been presented for the defendant most strongly from its every angle; but, after all he has said, we have not discovered any error in the record.

No error.