HARTFORD ACCIDENT & INDEMNITY COMPANY, ET AL PLAINTIFFS
    v. JOHN RANDOLPH INGRAM, COMMISSIONER OF INSUR-
    ANCE OF THE STATE OF NORTH CAROLINA, ET AL DEFENDANTS
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
    ET AL PLAINTIFFS v. JOHN RANDOLPH INGRAM, COMMISSIONER
    OF INSURANCE OF THE STATE OF NORTH CAROLINA, ET AL

No. 91

(Filed 14 July 1976)

1. Constitutional Law § 13— police power — public health — constitutional limitations

    While the police power is an inherent power of sovereignty and its exercise is especially favored in the regulation of the use of property and of individual conduct for the purpose of promoting the health of the public, the legislative power in this field is not unlimited but is subject to specific limitations imposed by the N. C. and U. S. Constitutions and to the general limitation thereof that the interference with individual liberty, or with the right of an owner of property to use it as he sees fit, must have a reasonable relation to the accomplishment of the legislative purpose and must not be unreasonable in degree, in comparison with the probable public benefit.

2. Constitutional Law § 13; Physicians, Surgeons and Allied Professions § 11— Health Care Liability Reinsurance Exchange Act — unconstitutionality

    The Health Care Liability Reinsurance Exchange Act, which requires all insurance companies licensed to issue in this State poli-

cies of "general liability insurance" to write policies for health care liability insurance in this State, to be members of the Health Care Liability Reinsurance Exchange, and to share in the losses of the Exchange, violates the Law of the Land and Equal Protection Clauses of Article I, § 19, of the N. C. Constitution and the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution.

APPEAL by the Commissioner of Insurance from *Bailey, J.,* at the 3 November 1975 Session of WAKE, heard prior to determination by the Court of Appeals.

These are 59 proceedings, each brought against the Commissioner of Insurance, hereinafter called the Commissioner, by one or more insurance companies, consolidated for hearing and determination in the Superior Court and upon appeal. They fall into two groups. The first group is composed of 25 actions for declaratory judgments in each of which the plaintiffs pray that Chapter 427 of the Session Laws of 1975, entitled "An Act to Establish a Health Care Liability Reinsurance Exchange," hereinafter called the Act, presently codified as Article 18C of Chapter 58 of the General Statutes, be declared unconstitutional and void, that its enforcement against the plaintiffs be enjoined and that certain orders of the Commissioner, purporting to be entered pursuant to the provisions of such Act, be set aside. The second group is composed of 34 proceedings, pursuant to G.S. 58-9.3, to obtain judicial review of the said orders of the Commissioner.

In yet another proceeding, the North Carolina Health Care Liability Insurance Exchange, hereinafter called the Exchange, filed in the Superior Court its petition for review of the same orders of the Commissisoner. By order of Bailey, J., it was made a party defendant to the second group of proceedings, its interest being the same as the interests of the petitioners therein, insofar as the validity of the Commissioner's orders is concerned. The Exchange filed its brief in the Supreme Court as appellee in the second group of cases, taking no part in the appeal from the judgment entered in the first group of cases, wherein a declaratory judgment of the unconstitutionality of the Act was sought.

Bailey, J., entered in each group of cases a judgment in which he made voluminous and detailed findings of fact and conclusions of law, substantially all of the material findings of fact being made pursuant to pre-trial stipulations, others being

Indemnity Co. v. Ingram, Comr. of Insurance

pursuant to testimony of and exhibits offered by witnesses for the plaintiffs concerning procedures leading to the issuance of the orders in question and the economic experience of the plaintiff companies in the writing of health care liability insurance in North Carolina under premium rates fixed by orders issued by the Commissioner. Though he did not stipulate the data so shown to be correct, the Commissioner did not introduce evidence in conflict with such evidence of the plaintiffs.

In each judgment, Bailey, J., adjudged that the Health Care Liability Reinsurance Exchange Act is unconstitutional and of no force and effect and that the Commissioner's orders in question are "unlawful, invalid, and of no force and effect." He enjoined the Commissioner from suspending the licenses of the plaintiffs, or taking any other action against them, on account of any failure by them to comply with the provisions of the said Act or any rule, order or regulation issued thereunder.

The plaintiff insurance companies are duly licensed by the State of North Carolina to engage in the business of issuing policies of "general liability insurance," as that term is defined in G.S. 58-173.37(6), which is part of the Act. With few exceptions, none of the plaintiff companies has engaged in or desires to engage in the issuing in North Carolina of policies of health care liability insurance. The St. Paul Fire & Marine Insurance Company, hereinafter called St. Paul, which insures approximately 80 per cent of the doctors practicing in this State, has, in recent years, sustained substantial losses in the writing of health care liability insurance in North Carolina under the premium rates established by orders of the Commissioner. In recent years, both the number and the size of claims for medical malpractice have increased substantially.

The testimony of expert witnesses for the plaintiffs, which is not controverted, is to the effect that health care liability insurance, also called medical malpractice liability insurance, is a type of insurance requiring highly specialized knowledge and skill on the part of actuaries, agents and claim adjusters. Bailey, J., so found. He also found, there being evidence to such effect, that other plaintiff companies, if required to write such insurance in North Carolina, would probably not have a sufficient volume of such business to justify the employment by them of personnel possessed of the high degree of technical training required to carry on such business efficiently and that their present personnel is not qualified to do so.

Medical malpratice insurance is unique among the various types of liability insrance in that the overwhelming majority of claims for medical malpractice are not filed until two or more years after the allegd malpractice occurred. This increases the difficulty of determing what is an adequate premium to be charged for an "ocurrence" policy; i.e., a policy insuring against liability for n "occurrence" in the policy year regardless of when the clan is filed. For this reason, among others, expert witnesses forthe plaintiffs testified, that, in their opinion, the writing of sch insurance would be more hazardous for inexperienced compaies, such as the great majority of these plaintiffs, than for xperienced companies, such as St. Paul.

Bailey, J., founas a fact that the writing of medical malpractice insurance rquires specialized training and expertise in numerous areas, inclding the adjustment and settling of claims, and that the naturesf medical malpractice insurance is such that a company reqired to enter that insurance field without experience and qualfied personnel "could easily suffer serious losses in this line of insurance." He further found, there being evidence to that effct, that no company presently writing medical malpractice insrance voluntarily accepts all of the applications therefor tendeed to it. That is, there are licensed providers of health care serve which such companies regard as uninsurable. The Act herein question provides that every resident of this State holding a valid license to practice herein a health care profession is an "digible risk" and any insurer is required by the Act to insure any such "eligible risk," with the right in the insurer to cede (i.., transfer the profit or loss) such business to the Exchange, which, in turn, will allocate the profits or losses to its menber companies according to a prescribed formula. Thus, losses due to the inexperience of the insurer, as well as those due to other causes, are required to be borne proportionately by all companies.

Bailey, J., also found that the medical malpractice insurance rates prescribed by the orders of the Commissioner of which the plaintiffs complain are "grossly inadequate and will require the plaintiffs to write medical malpractice insurance in North Carolina at confiscatorily low rates which will result in substantial losses to said plaintiffs" and that the plan for the operation of the Exchange prescribed by the Commissioner in the said orders was not in accord with the provisions of the Act.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Assistant Attorney General, for John Randolph Ingram, Commissioner of Insurance.*

*Young, Moore, Henderson & Alvis by Charles H. Young.*

*Allen, Steed, Pullen, P.A. by Arch T. Allen and Arch T. Allen, III.*

*Bode & Bode, P.A. by Robert V. Bode.*

*Broughton, Broughton, McConnell & Boxley, P.A. by William G. Ross, Jr.*

*Cockman, Aldridge & Davis by John E. Aldridge, Jr.*

*Gulley & Green by Charles P. Green, Jr.*

*Jordan, Morris & Hoke by John R. Jordan, Jr.*

*Jordan, Wright, Nichols, Caffrey & Hill by William L. Stocks.*

*Manning, Fulton & Skinner by John B. McMillan.*

*Maupin, Taylor & Ellis, P.A. by Wm. W. Taylor, Jr.*

*Sanford, Cannon, Adams & McCulloch by Robert W. Spearman.*

*Smith, Moore, Smith, Schell & Hunter by O. Max Gardner, III.*

*Teague, Johnson, Pattterson, Dilthey & Clay by Woodrow Teague.*

*Attorneys for plaintiff appellees.*

*Bailey, Dixon, Wooten, McDonald & Fountain by J. Rufffin Bailey for North Carolina Health Care Liability Reinsurance Exchange.*

LAKE, Justice.

G.S. 58-72, not part of the Act of 1975 here in question, provides:

> *"Kinds of insurance authorized:*—The kinds of insurance which may be authorized in this State, subject to other provisions of this Chapter, are set forth in the following

paragraphs. *Nothing herein contained shall require any insurer to insure every kind of risk which it is authorized to insure.* * * *

"(13) 'Personal injury liability insurance,' meaning insurance against legal liability of the insured, * * * arising out of the death or injury of any person, or arising out of injury to the economic interests of any person as a result of negligence in rendering expert, fiduciary or professional service, * * *

"(14) 'Property damage liability insurance,' meaning insurance against legal liability of the insured, * * * arising out of the loss or destruction of, or damage to, the property of any other person, * * * ." (Emphasis added.)

Pursuant to this statute, St. Paul and a few other companies have engaged in the writing of medical malpractice insurance in North Carolina, but most of the plaintiff companies have elected not to write such insurance but to limit their liability insurance writing to insurance against other types of liability.

In 1975, the Act here in question was enacted. It is codified as Article 18C of Chapter 58 of the General Statutes, G.S. 58-173.34 et seq. It purports to deprive the plaintiffs of this election. Its provisions pertinent to the decision of this appeal are as follows (emphasis added throughout):

G.S. 58-173.34. *"Declarations and purpose of the Article.*—It is hereby declared by the General Assembly of North Carolina that the availability of health care liability insurance for physicians and surgeons * * * hospitals and others engaged in the healing practicing arts is necessary for the economic welfare of the State and that without such insurance health care services may be severely curtailed; and that while the need for such insurance is increasing, the supply is not adequate and is likely to become less adequate in the future; and that present plans to provide adequate health care liability insurance in North Carolina have not been sufficient to meet the needs of our citizens. It is further declared that *the State has an obligation to provide an equitable method whereby every insurer licensed to write general liability insurance in North Carolina be required to meet this market demand.*

It is the purpose of this Article to define this obligation and provide a *mandatory* program to assure an adequate supply of health liability insurance coverages in the State of North Carolina."

G.S. 58-173.37. *"Definitions.*—As used in this Article:

"(1) 'Cede' or 'Cession' means the act of transferring *the profit or loss of otherwise unacceptable business* (to the extent permitted in the plan of operation) *from the individual insurer to all insurers* through the operation of the Exchange. * * *

"(4) 'Eligible risk' means a person who is a resident of this State who holds a valid license to practice or perform in this State a given health care profession * * * including but not limited to * * * physicians, surgeons, dentists, nurses, nurse anesthetists, physiotherapists, medical or X-ray laboratories, chiropractors, chiropodists, optometrists, osteopaths and blood banks * * *

"(6) 'General liability insurance' means insurance against legal liability of the insured as authorized under G.S. 58-72(13) and (14), excluding insurance against liability arising out of the ownership, operation, maintenance and use of a motor vehicle * * *

G.S. 58-173.38. *"North Carolina Health Care Liability Reinsurance Exchange; creation; membership.*—(a) There is created a nonprofit unincorporated legal entity to be known as the North Carolina Health Care Liability Reinsurance Exchange *consisting of all insurers licensed to write and engaged in writing within this State general liability insurance* or any component thereof *except* town and county mutual insurance associations and assessable mutual companies * * * . *Every such insurer, as a prerequisite to further engaging in writing such insurance in this State, shall be a member of the Exchange and shall be bound by the rules of operation thereof* as provided for in this Article and as promulgated by the board of governors. *No company may withdraw from membership in the Exchange unless it ceases to write general liability insurance in this State or ceases to be licensed to write such insurance.* * * *

G.S. 58-173.42. *"General obligations of insurers. —* Except as otherwise provided in this Article all insurers *as a prerequisite to the further engaging in this State in the writing of general liability insurance* or any component thereof shall accept and insure *any applicant therefor who is an eligible risk* if cession of the particular coverage and coverage limits applied for are permitted in the Exchange. All such insurers shall equitably share the results of any health care liability insurance business ceded to and through the Exchange and shall be bound by the acts of their agents in accordance with the provision of this Article."

G.S. 58-173.44. *"The Exchange; functions; administration.*— (a) The operation of the Exchange shall assure the availability of *all* health care liability insurance coverages *to any eligible risk* by means of reinsurance and *the Exchange shall accept for transfer to the account of all members the profit or loss of the business ceded* in accordance with this Article, the plan of operation adopted pursuant thereto, and any amendments to either. * * *

"(e) The Exchange shall require each member to adjust losses for ceded business * * * in the same manner as other insurance losses are adjusted and to effect settlement where settlement is appropriate; * * *

"(i) * * * [P]ower and responsibility for the * * * operation of the Exchange is vested in the board of governors, which power and responsibility include but are not limited to the following: * * *

> "(8) To establish fair and reasonable procedures for the sharing among the members of profit and loss on Exchange business and other costs, charges, expenses, liabilities, income, property and other assets of the Exchange and for assessing or distributing to members their appropriate shares. Such shares may be based on the member's direct written premium for general liability insurance or by any other fair and reasonable method. * * *

G.S. 58-173.46. *"No limit on cessions; compulsory cessions.*—Upon receipt by the company of a risk *which it does not elect to retain,* the company shall follow such procedures for ceding the risk as are established by the plan of opera-

tion. A company *may* cede to the Exchange one hundred percent (100%) of its health care liability insurance business in North Carolina. In order to prevent significant adverse selection resulting from cessions to the Exchange, the board of govenors upon a finding of significant adverse selection *shall require* one hundred percent (100%) ceding by *all members* of the coverages on any of the separate eligible risk categories enumerated in G.S. 58-173.37(4). There shall be a presumption that significant adverse selection exists if for any period of one year or more the result from dividing the losses incurred by the premiums earned on business ceded to the Exchange is in excess of one hundred and five percent (105%) of the result of dividing the losses incurred by the premiums earned on business retained by the members.

G.S. 58-173.47. *"Approval of rates.*—The premium rates that may be charged on all health care liability insurance, including premiums ceded to the * * * Exchange shall be established from time to time by the Commissioner * * * on the basis of the latest available statistical data submitted by rating bureaus or insurers authorized to write general liability insurance in this State. Every rating bureau * * * or insurer * * * may submit proposed changes in rates * * * to the extent necessary to produce rates and classifications which are reasonable, adequate, not unfairly discriminatory and in the public interest, or the Commissioner, upon his own motion, may, upon the latest available statistical data, order a reduction or increase in rates. Any premium rate change shall be established by the Commissioner only after due notice and hearing as provided in G.S. 58-9.2 and with full rights of appeal * * *. The rate so established by the Commissioner shall be reasonable, adequate, not excessive, not unfairly discriminatory and in the public interest. Such rates shall not be deemed unreasonable, inadequate, excessive, unfairly discriminatory or not in the public interest if they are adequate to defray the total cost of the Exchange system and if they make adequate provision for premium rates for the future which will provide for anticipated losses, anticipated loss adjustment expenses, other anticipated expenses attributable to the selling and servicing of this line of insurance, and a fair and reasonable underwriting profit. * * *."

The General Assembly has, in G.S. 58-173.34, above quoted, determined and declared that unless health care liability insurance is available to persons engaged in the practice of the healing arts, such health care services in this State may be severely curtailed, that the supply of such insurance available to such practitioners in this State is not adequate and plans, in effect prior to the passage of the North Carolina Health Care Liability Insurance Exchange Act, are inadequate to supply the need for such insurance. We accept these determinations by the General Assembly, there being evidence in the record tending to show the reasonableness thereof.

[1]    The police power of the State extends to all of the great public needs. *Noble State Bank v. Haskell,* 219 U.S. 104, 111, 31 S.Ct. 186, 55 L.Ed. 112 (1911). It is an inherent power of sovereignty and its exercise is especially favored in the regulation of the use of property and of individual conduct for the purpose of promoting the health of the public. *Graham v. Insurance Co.,* 274 N.C. 115, 124, 161 S.E. 2d 485 (1968) ; *Roach v. Durham,* 204 N.C. 587, 591, 169 S.E. 149 (1933) ; *Shelby v. Power Co.,* 155 N.C. 196, 71 S.E. 218 (1911). Even in this field, however, the legislative power is not unlimited but is subject to specific limitations imposed by the Constitution of this State and the Constitution of the United States. It is also subject to the general limitation thereof that the interference with individual liberty, or with the right of an owner of property to use it as he sees fit, must have a reasonable relation to the accomplishment of the legislative purpose and must not be unreasonable in degree, in comparison with the probable public benefit. *In Re Hospital,* 282 N.C. 542, 193 S.E. 2d 729 (1973) ; *Cheek v. City of Charlotte,* 273 N.C. 293, 160 S.E. 2d 18 (1968) ; *State v. Warren,* 252 N.C. 690, 694, 114 S.E. 2d 660 (1960) ; *Winston-Salem v. R. R.,* 248 N.C. 637, 642, 105 S.E. 2d 37 (1958) ; *State v. Harris,* 216 N.C. 746, 6 S.E. 2d 854 (1940) ; *State v. Perley,* 173 N.C. 783, 92 S.E. 504 (1917), aff'd, 249 U.S. 510.

The wisdom of legislation, which is within the power of the General Assembly, is not for this Court to determine and the determination by the General Assembly that a factual situation exists, giving rise to the public need which the statute is designed to remedy, will not be disturbed by this Court where there is any reasonable basis for such determination. However, the further declaration by the General Assembly in G.S.

58-173.34 that "the State has an obligation to provide an equitable method whereby every insurer licensed to write general liability insurance in North Carolina be required to meet this market demand" does not fall within this sound principle inherent in the separation of the powers of government made by the Constitution. The determination of the existence of an obligation resting upon the State and of the power of the State to require a specified group of persons or corporations to supply an existing public need are questions of law, the ultimate authority for the determination of which is in this Court.

Assuming, without deciding, that the State of North Carolina has an obligation to provide some equitable method whereby those whom it licenses to practice one of the healing arts may procure insurance against liability for injuries caused by their negligence in such practice, it does not necessarily follow that the State has power to conscript certain persons or corporations, or a certain group thereof, and require such draftees to supply the need at their risk or expense. As Mr. Justice Holmes, speaking for the Supreme Court of the United States, said in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922), "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

[2] We do not have before us the question of whether it would be within the authority of the Legislature to appropriate public funds for the providing of health care liability insurance in order to supply the need which the General Assembly, in G.S. 58-173.34, has declared to exist. We now express no opinion upon that question. The question for our determination is this, May the General Assembly, having found such need to exist, require all insurance companies licensed to issue in this State policies of "general liability insurance," subject to specified exceptions, to supply, at their own risk and expense, the need for health care liability insurance, such companies not having heretofore engaged in the business of writing insurance of that kind, having no desire to write such insurance and having never held themselves out as willing to do so? We hold that the General Assembly does not have that power and, consequently, the Act in question is unconstitutional and void.

The above quoted definition of "general liabilitiy insurance," contained in the Act, includes insurance against liability for personal injury and insurance against liability for property damage. Prior to the adoption of the Act here in question, G.S. 58-72 expressly provided that nothing in Chapter 58 of the General Statutes required any insurance company to insure every kind of risk it was licensed to insure. This, of course, would not, of itself, prevent a change of this State policy by subsequent legislation. However, G.S. 58-72 makes it clear that the mere obtaining of a license to write insurance against liability for property damage, or for personal injury, was not an undertaking by the licensee to write policies insuring against liability for medical malpractice.

The record before us makes it abundantly clear that the issuance of policies of health care liability insurance is a part of the broad field of the insurance business separate and distinct from the issuance of policies protecting owners of buildings from liability for personal injury to persons using such buildings, from the issuance of policies protecting the producer of commodities from liability for injuries to users thereof, from the issuance of policies protecting promoters of athletic events or other entertainments from liability for injury to participants or spectators, and from a myriad of other types of liability insurance policies. If this did not appear from the record, it is a matter of such common knowledge that we could properly take judicial notice of it. Stansbury, North Carolina Evidence (Brandis' Revision) § 11.

Quite clearly, a company which has been carrying on a business of insuring against liability for property damage only would be thrown, by the Act in question, into a type of business utterly foreign to its undertaking and experience. It is further abundantly clear from the record that to compel such company, against its will, to write health care liability insurance for whatever health care provider may see fit to apply to it therefor would subject the company to a risk of financial disaster. It is no answer to the objection of such company that the Act provides for its "ceding" of all health care liability policies to the Exchange. By definition in the Act, G.S. 58-173.37(1), such ceding simply transfers "the profit or loss" of such policy from the writing company to the Exchange. The writing company may, by the Act, G.S. 58-173.44(e), be, nevertheless, required to handle, and thus incur the expense of, the adjustment and

settlement of claims under such policy, and must bear its proportionate part of the losses, not only on its own policies but on those ceded by all other companies to the Exchange. G.S. 58-173.44 (i) (8). Thus, a company writing but a few policies, itself, on which no loss is sustained, may be severely crippled financially by the writings of other equally inexperienced and equally reluctant insurers.

Furthermore, an experienced, efficient, successful writer of health care liability insurance, which elects to cede no policies to the Exchange, may be assessed by the Exchange for its proportionate part of losses incurred by the Exchange upon policies issued by other companies. G.S. 58-173.44. Membership in the Exchange, and so participation in its losses, is made mandatory by this Act and no company issuing any form of insurance against liability for personal injury or property damage, except as provided in the Act, may withdraw from the Exchange without ceasing to write all forms of such liability insurance in this State. G.S. 58-173.38.

It is no answer to the complaint of the insurance company, objecting to being drafted by the State for this alleged public service, that the Act contemplates, in G.S. 58-173.47, the establishment of premium rates for such insurance which will be "reasonable" and "adequate" and sufficient to yield "a fair and reasonable underwriting profit" over and above "anticipated losses" and "anticipated expenses." The losses and expenses "anticipated" by the Commissioner in the establishment of premium rates may easily prove substantially less than those actually incurred. The record shows, with disturbing clarity, that this has been the experience in the past of companies voluntarily writing such insurance, even though those companies are possessed of qualified employees having the expertise incident to years of experience in the business and even though those companies have, heretofore, had the right to reject applicants deemed by them uninsurable, a right which the Act undertakes to abolish. But, even if it could be assumed that premium rates would be established sufficient to assure the company "a reasonable underwriting profit," the Law of the Land Clause of Article I, § 19, of the Constitution of North Carolina, providing that no person shall be deprived of his liberty but by the Law of the Land, would forbid the State so to conscript the plaintiff companies for this service. By reason of this constitutional provision, the simple statement, "I don't want to," is

still a sufficient answer to some governmental demands of this State.

By the definition of "general liability insurance" contained in G.S. 58-173.37 (6), companies issuing only automobile liability insurance are exempt from this legislative conscription of liability insurance carriers into the proposed army of health care liability insurers. No reasonable basis for this classification of liability insurance companies appears. The Act, therefore, also violates the provision in Article I, § 19, of the Constitution of North Carolina which states, "No person shall be denied the equal protection of the laws."

Of course, the business of writing insurance against liability for personal injury and property damage is such that the State may lawfully regulate it in the public interest. This is axiomatic. It does not follow, however, that one engaging in such business in this State is subject to whatever regulation thereof the State may see fit to impose. We need not, upon the present appeal, determine whether the State may constitutionally require a company voluntarily engaging in the health care liability insurance business to insure all licensed providers of health care services against liability for their negligence in their practice. See: G.S. 20-279.34(2) as to compulsory participation in a similar plan by automobile liability insurance companies; *Jones v. Insurance Co.*, 270 N.C. 454, 155 S.E. 2d 118 (1967). This Act requires the writing of such insurance by companies who never have engaged, and do not want to engage and are not equipped to engage, in the business at all. This, Article I, § 19, of the Constitution of North Carolina forbids.

The State may not, consistent with the Law of the Land Clause of Article I, § 19, of the Constitution of North Carolina, or the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, require such a company to engage in such a business as a condition to its right to continue to carry on an entirely different business for which it is duly licensed by the State and in which it wants to be, and is, engaged.

While the State may, and does, require one desiring to engage in the business of writing insurance against liability for personal injury or property damage to obtain a license, the State may not, as a condition to the issuance of such license, require the applicant to engage in and carry on an entirely

different kind of business. "A State cannot under the guise of protecting the public arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions on them." *Roller v. Allen,* 245 N.C. 516, 525, 96 S.E. 2d 851 (1957). In *Aetna Casualty & Surety Co. v. Commissioner of Insurance,* 358 Mass. 272, 263 N.E. 2d 698 (1970), the Supreme Judicial Court of Massachusetts said, "The writing of insurance is a lawful business and the Commonwealth may not impose unconstitutional conditions upon the exercise of the right to engage therein." There, the Massachusetts Court was speaking specifically of the right of a company to engage in the insurance business without being required to submit to confiscatory premium rates established by the State. The principle, however, applies equally to the right to engage in one branch of the insurance business without being required to engage in another separate, distinct branch thereof.

The Supreme Court of the United States has held that a private carrier cannot be converted, against his will, into a common carrier by mere legislative command and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States forbids a State to bring about the same result by imposing, as a condition precedent to the issuance of a license to one who desires to engage in the business of a private carrier, a requirement that the applicant become a common carrier. *Frost Trucking Co. v. Railroad Commission of California,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). Similarly, a state may not, as a condition to the issuance of a license, exact from the licensee a waiver of his right to exercise a constitutional right such as the right to remove litigation to the Federal Courts. *Terral v. Burke Construction Co.,* 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352 (1922); *Lee v. Renfro,* 257 Ala. 679, 60 So. 2d 849 (1952). Thus, the State may not, as a condition precedent to the right of the plaintiffs to retain their licenses to engage in the business of insuring against liability for personal injury or property damage from other risks, require them to enter into the entirely separate and distinct business of insuring against liability for personal injury resulting from the practice of medicine.

The Act contains a severability clause, providing: "If any provision or part of this Article or application thereof is held invalid, the invalidity shall not affect other provisions, parts or application of the Article which can be given effect without

the invalid provisions or application, and to this end the provisions of this Article are severable." Session Laws of 1975, Chapter 427, § 2. However, it is specifically declared in G.S. 58-173.34 that the purpose of the entire Act is to impose, upon all companies licensed to write in North Carolina insurance against liability for personal injury or property damage, a mandatory program for the writing by them of health care liability insurance. All parts of the Act are related to, and designed to accomplish, this unconstitutional purpose. Therefore, the entire Act is in excess of the power of the General Assembly under the Constitution of this State.

The orders of which the plaintiffs complain depend for their validity upon the Act here in question. They purport to be issued pursuant thereto. The Commissioner does not contend that they find support in any other statutory delegation of authority to him. Consequently, the orders in question are also invalid and it is not necessary for us to consider whether the Superior Court was correct in holding that these orders were invalid for the further reason that they were not issued in accordance with the provisions of the Act. The result would be the same if they were so issued. Similarly, it is not necessary for us to consider the validity of other reasons advanced by the judgment of the Superior Court for its conclusion that the Act in question is unconstitutional.

Both in the judgment entered in the group of actions for a declaratory judgment and in the judgment entered in the group of proceedings seeking judicial review of the orders of the Commissioner, the Superior Court concluded correctly that the Health Care Liability Reinsurance Exchange Act is unconstitutional and properly adjudged it to be of no force and effect. We affirm those conclusions and the resulting judgments.

Affirmed.