INSURERS' ACTION COUNCIL, INC., a Nebraska Corporation, Woodmen Accident & Life Company, a Nebraska Corporation; Time Insurance Company, a Wisconsin Corporation; Mutual of Omaha Insurance Company, a Nebraska Corporation; Business Men's Assurance Company of America, a Missouri Corporation; the Midwest Life Insurance Company of Lincoln, Nebraska; Mutual Protection Insurance Company, a Nebraska Corporation; American Republic Insurance Company, an Iowa Corporation; American Home Assurance Company, a New York Corporation; Illinois Mutual Life & Casualty Company, an Illinois Corporation; Physicians Mutual Insurance Company, a Nebraska Corporation, Plaintiffs,

v.

Michael MARKMAN, Commissioner of Insurance, the Minnesota Department of Commerce, Insurance Division, and Minnesota Comprehensive Health Association, Defendants,

v.

UNITED CEREBRAL PALSY, Minnesota Epilepsy League, Minnesota Association for Retarded Citizens, Michael L. Berde and Carole T. Berde, Intervenors.

Civ. No. 3–76–440.

United States District Court,
D. Minnesota,
Third Division.

May 21, 1980.

Frank Claybourne, Doherty, Rumble & Butler, St. Paul, Minn., and Robert J. Schmit, Joseph R. Kernan, Jr., McGovern, Opperman & Paquin, Minneapolis, Minn., for plaintiffs.

Warren Spannaus, Atty. Gen., by Richard B. Allyn, Chief Deputy Atty. Gen., and Richard S. Slowes and Reynaud Harp, Sp. Asst., Attys. Gen., St. Paul, Minn., for defendants Michael Markman, Commissioner of Ins., and the Minnesota Dept. of Commerce, Ins. Div.

Warren Spannaus, Atty. Gen., by Richard B. Allyn, Chief Deputy Atty. Gen., John F. Stone and Margo S. Struthers, Minneapolis, Minn., for defendant Minnesota Comprehensive Health Association.

Patricia A. Suita, Legal Aid Society of Minneapolis, Inc., Minneapolis, Minn., for defendant intervenors.

Warren Spannaus, Atty. Gen., by John A. Breviu, Sp. Asst. Atty. Gen., Minneapolis, Minn., for amicus Commissioner of Health.

Richard W. Johnson, Grand Marais, Minn., for amicus, Health Ins. Ass'n of America.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

This declaratory judgments action by accident and health insurance carriers against Minnesota Insurance regulatory officials challenges the constitutionality of the Minnesota Comprehensive Health Insurance Act which makes minimum health insurance benefits available to all persons in the state. The law, first enacted in 1976 and amended in 1977, 1978, 1979 and 1980 requires insurance carriers to offer certain minimum levels of coverage and to participate in a pool to provide major medical coverage for persons not ordinarily insurable. These and other provisions of the law are challenged on due process, equal protection, impairment of contract, commerce clause, and other grounds.

The court denied a preliminary injunction against implementation of the new law in December 1976, *Insurers Action Council v. Heaton*, 423 F.Supp. 921 (D.Minn.1976) finding that plaintiffs then had not shown a substantial probability of success on the merits.

The matter was assigned to the magistrate for a hearing and report pursuant to 28 U.S.C. § 636(b)(2) and Rule 53(e) Fed.R. Civ.P.

The magistrate received evidence, made findings and recommended that the Act, and Minn.Stat. §§ 62A.16, 62A.17, be declared unconstitutional. Defendants filed objections to the magistrate's report and recommendations and appealed to the court.

Briefs have been received and argument heard. The court finds the challenged laws a proper exercise of legislative authority within the Constitution. To the extent that the magistrate's findings are clearly erroneous and his conclusions of law are in error, the court sets them aside and makes its own findings and draws its own legal conclusion.

*Introduction*

Plaintiffs are foreign insurance companies and an association of insurance carriers which sell or have sold accident and health insurance in the state of Minnesota. Defendants are Michael Markman, Commissioner of Insurance, the Insurance Division of the Minnesota Department of Commerce, and the Minnesota Comprehensive Health Association, a non-profit corporation established by the Act. United Cerebral Palsy, Minnesota Epilepsy League, Minnesota Association for Retarded Citizens, Michael L. Berde and Carol T. Berde intervened as defendants in support of the Act. The Minnesota Catholic Conference, Minnesota Public Interest Research Group, Senior Citizens' Coalition of Greater St. Paul, Inc., Senior Citizens' Legislative Council of St. Paul, and Metropolitan Senior Federation, Inc., appeared as *amici curiae* in support of the Act; the Health Insurance Association of America participated as *amicus curiae* in opposition to the Act.

The Comprehensive Health Insurance Act, Minn.Stat. § 62E.01 *et seq.*, (Act), seeks to make available adequate health care coverage to Minnesota residents by: 1) requiring insurers writing accident and health insurance in this state to offer a qualified plan which meets certain basic levels of coverage, including major medical coverage, Minn.Stat. §§ 62E.04, subd. 4, 62E.06 and by 2) creating a state plan to provide qualified plan coverage for "uninsurables," which is financially underwritten by members of an Association mandatorily consisting of all companies writing accident and health insurance, Minn.Stat. § 62E.08, .10, .11 and by 3) requiring that persons insured under a group plan be permitted, upon termination of affiliation with the group, to convert the group policy to an individual policy which meets the qualified plan requirements. Minn.Stat. § 62E.16.

The magistrate recommended that the Act be declared unconstitutional on due process, impairment of contract, equal protection, and commerce clause grounds. The magistrate also held that the Insurance Commissioner's rule making authority un-

der the law violated the non-delegation doctrine. The court considers each of those grounds making a de novo review of the law and adopting the magistrate's finding unless clearly erroneous. Rule 53(e), Fed.R. Civ.P.

### 1. *Due Process*

■ The magistrate held that the mandatory coverage provisions were arbitrary and unreasonable and bore no rational relationship to a legitimate government purpose and that forcing all accident and health insurers into the major medical field, unconstitutionally conditions plaintiffs entry into the state upon the surrender of their constitutional rights.

The court's starting point in a due process analysis must be the appropriate standard of review. *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The Minnesota Comprehensive Health Insurance Act is social-economic legislation designed to assure adequate health care coverage for all Minnesota residents. It is well established that

> . . . [such] legislative Acts . . come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary or irrational way.

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Act is part of a broader bill, ". . . relating to health care, providing for establishment and administration of certain plans of health insurance to make minimum benefits available to all persons in the state . . ." 1976 Minn. Laws ch. 296. It was enacted after 18 months of hearings which showed that thousands of Minnesotans suffered because they did not have adequate health care coverage.

The investigation by the Special Senate Subcommittee on Health Costs revealed rapidly rising health care costs: medical care increased threefold and hospital rooms increased sevenfold between 1947–1972, (Report of Special Senate Subcommittee on Health Costs, March 5, 1975, Defendants' trial Exhibit N at p. 4) (hereafter Report), and a significant number of residents who did not have or could not obtain adequate health care coverage: 28.2% of those under 65 did not have major medical, Report at 192, 12.2% had no coverage for hospital bills, *Id.*, and an estimated 5% could not obtain coverage. *Id.* at 196. The testimony revealed that the high medical costs imposed significant hardship on residents: Dr. Warren Warwick testified that many of his patients must choose between using their money for living expenses or for needed medical care, a study of 75 bankruptcy cases filed in the United States District Court in St. Paul showed that medical bills constituted more than 25% of the bankrupt's debts in 14% of the cases, *Id.* at 178–79, a similar study in Ohio showed that 26% of the bankruptcies filed in one week were directly due to high medical costs and the lack of insurance to cover the costs, *Id.*, and evidence the committee had before it indicated that the economic effect of health care was minor in 40% of the cases, moderate in 31%, severe in 20% and very severe in 9%. *Id.* at 178. In addition the Subcommittee investigation showed an increasing burden on local, state and federal governments in shouldering the health care costs, Minnesota medical assistance payments increased from $69 million in 1967 to $227 million in 1974 and were projected to rise to $336 million in 1977. *Id.* at 201–203. The testimony also indicated that consumer confusion contributed to the lack of adequate health care coverage. *Id.* at 184–85.

Based on the findings of the Senate Subcommittee Report, the legislature properly could have concluded that the social and financial hardships caused by high health care costs were due, in part, to the unavailability of insurance providing an adequate amount and breadth of coverage and to consumer confusion concerning the availability of coverages.

Viewed in light of the applicable standard of review the Act does bear a rational relationship to the legislature's concern for assuring the availability of adequate health

care coverage to all residents. The mandatory coverage provisions assure that all persons have made available an adequate amount of coverage, up to $250,000, Minn. Stat. § 62E.04, subd. 4, and an adequate breadth of coverage, Minn.Stat. § 62E.06; the state plan provisions assure that those not normally insurable have made available the same coverage at a reasonable cost, Minn.Stat. §§ 62E.14, 62E.08. The legislation must, therefore, be sustained on due process grounds. *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).[1]

This is not a case where the state is attempting to extract a surrender of constitutional rights as a condition of doing business in this state as urged by plaintiffs. It is well established that though a state may have the power to exclude certain corporations from the state or to take over an entire area of business and leave no part for private enterprise, a state may not condition the right to do business upon a surrender of constitutional rights. *Michigan Public Utilities Commission v. Duke*, 266 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445 (1925); *Accord, Watson v. Employers Liability Assurance Corp.*, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954) *rehearing denied* 348 U.S. 921, 75 S.Ct. 289, 99 L.Ed. 722 (1955) (Frankfurter J. concurring) and cases cited 348 U.S. at 80–82, 75 S.Ct. at 174–175 therein. On that theory it has been held that government cannot force a person into an entirely new business as a condition of doing business in the state. *Michigan Public Utilities Commission, supra; Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926) (private carriers could not be forced into common carrier business as a condition to use of highways) (criticized in *Watson, supra* 348 U.S. at 82 n. 3, 75 S.Ct. at 175 n. 3); *Midwest Video Corporation v. United States*, 441 F.2d 1322 (8th Cir. 1971) (F.C.C. could not force cablecasters into entirely new business of program origination as condition to entering CATV business) (dictum) *rev'd on other grounds*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *Midwest Video Corporation v. Federal Communication Commission*, 571 F.2d 1025, 1050–52 (8th Cir. 1978) (F.C.C. mandatory access rules unconstitutionally forced cablecasters to offer services as common carriers) (dictum). But this legislation requires no surrender of constitutional rights.

The magistrate found that major medical is a unique, highly specialized field of insurance and that some companies have neither the personnel, expertise nor financial resources to enter that field. That finding was based largely on the testimony of William B. Amdor, Vice President and Associate General Counsel of Physicians Mutual Insurance Co. He testified that the major medical field is a unique, specialized field that only the "giants" can enter, and that it is a "loser" financially. The overwhelming weight of the evidence is contrary to the magistrate's finding.

Mr. Amdor's own testimony indicates that Physicians Mutual offers a cancer policy with coverage up to $250,000, the amount required under the Act; and that his company offers policies which, taken together, provide the various types of cov-

---

1. The magistrate's reasoning is reminiscent of the substantive due process analysis prevalent in the *Lochner* era. (*Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). The problem with substantive due process analysis is that it vests in the judiciary the duty to substantively judge the value decisions, *Id.* at 74, 25 S.Ct. at 546 (Holmes, J. dissenting) and fact findings *Id.* at 65, 25 S.Ct. at 547. (Harlan, J. dissenting) of the legislature. *But see*, Tribe, American Constitutional Law § 8–7 (1978) at 452–455, wherein the author rejects the "wholesale abdication to the political process" for all social and economic legislation, and argues that judges do and properly must make substantive judgments on such legislation. Conceptually, at least, some limit on the exercise of the police power must be recognized. That limit certainly is reached when the burden becomes so onerous so as to constitute a taking, or a direct violation of some other constitutional right, and may be reached where the burden imposed on the regulated group is "utterly unreasonable" as compared to any conceivable goal of the statute. The magistrate held that the statute did not constitute a taking, and the court finds *infra* that the means used are not utterly unreasonable when compared to the ends sought.

erages required under the Act. A representative from Illinois Mutual, an insurer smaller than Physicians Mutual testified that his company offers the equivalent of a qualified plan, including major medical coverage up to $250,000, which indicates that the mandatory coverage requirements are not unduly burdensome. Furthermore, the statute applies only to those accident and health carriers which already offer hospital, surgical or medical coverage, Minn.Stat. § 62E.02, subds. 10 and 11, the statute authorizes the insurer to apply its own underwriting standards, Minn.Stat. § 62E.04, subd. 7; and does not preclude an insurer from charging a premium commensurate with the coverage. Significantly, the Act does not require the insurers to bear the cost of insuring the high risk or uninsurables. Minn.Stat. §§ 62E.11, subd. 5, 62E.11 subd. 8. The Act therefore does not require the insurer to insure a generically different class of risks or to bear the cost of providing the additional coverage to the normal, the high risk or the uninsurable.

The only burden imposed on insurers is that of establishing underwriting standards and premium rates for the additional coverage and administering the policy. Mr. Amdor's testimony that his company is not equipped to, and could not meet that burden is rebutted by Andrew Czajkowski's testimony that Blue Cross-Blue Shield hired a consulting actuary to determine appropriate premium rates at a cost of $2500.00, and that its cost to increase coverage from $10,-000 to $250,000 was only $4.80 per person. The administrative burden is further ameliorated by the reinsurance provisions. Section 62E.04, subd. 6 allows the insurer to fulfill its obligations by issuing the coverage in its own name and reinsuring the risk with the Association. The Association then assumes the administration of the coverage. Minn.Stat. §§ 62E.04, subd. 6; 62E.10, subd. 7(e), (f).[2] In such cases the insurer merely acts as a conduit for providing the coverage.

Though there is some evidence to support the magistrate's finding that major medical is a unique, specialized field and not within the reach of some insurers, there was overwhelming evidence to the contrary and we are satisfied that the finding is clearly erroneous. Upon a review of the entire record the court "is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Solomon v. Crown Life Insurance Company*, 536 F.2d 1233, 1239 (8th Cir. 1976); 9 Wright & Miller, Federal Practice & Procedure § 2585 at 731 (1971), and therefore sets aside that finding.

In our view the validity of this legislation clearly falls within the holdings in *California State Auto Ass'n Inter Insurance Bureau v. Maloney*, 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951) (statute requiring all automobile carriers to participate in a state plan which provided coverage to high risk insureds sustained on due process grounds); and *Health Insurance Ass'n of America v. Harnett*, 44 N.Y.2d 302, 405 N.Y.S.2d 634, 376 N.E.2d 1280 (1978) (requiring all accident and health carriers to provide maternity coverage sustained on due process grounds).

*Hartford Accident & Indemnity Company v. Ingram*, 290 N.C. 457, 226 S.E.2d 498 (1976) upon which plaintiffs rely, is distinguishable in that the statute there required all general liability insurers to offer medical malpractice insurance. The statute forced insurers who had previously limited their business to property insurance, to enter the medical malpractice field, and thereby insure a generically different class of risk, the court there based its holding on that ground and expressly left open the issue of whether the Act, if limited to accident and health carriers, would be upheld. *Id.* 226 S.E.2d at 507. Moreover, in that case all insurers were required to assume their pro rata share of the costs of insuring the high risk and there was a showing that the commis-

---

2. Minn.Stat. § 62E.04, subd. 6 gives insurers a statutory right to fulfill its obligations through the reinsurance provisions of section 62E.10, subd. 7(e), (f). The former provision therefore makes the Association's obligation to provide reinsurance mandatory.

sioner traditionally set premiums unreasonably low.

With respect to plaintiffs' due process challenge, the court holds that there is a rational relationship between the major medical, state plan and mandatory coverage provisions and the social and financial hardships caused by high health care costs; that major medical is not an entirely new line of business which some insurers cannot enter; and that numerous provisions of the Act significantly ameliorate the burdens imposed on the insurer. The statute is therefore sustained on due process grounds.

### 2. Equal Protection

■ The equal protection claim was raised by the magistrate and his ruling on it is based on a misinterpretation of the provisions concerning the Minnesota Comprehensive Health Association.

Minnesota Statutes § 62E.10 establishes the association, membership in which is mandatory. Minn.Stat. § 62E.10, subd. 3. The association must establish a state plan, Minn.Stat. §§ 62E.08, 62E.11, to provide qualified plan coverage to those who would otherwise be considered high risk or uninsurable. Minn.Stat. § 62E.14. The premium to be charged for state plan coverage is, in general terms, set at 125% of the average premiums for qualified plan coverage. Minn.Stat. § 62E.08, subd. 1. All "contributing members" must assume a pro rata share of the losses incurred by the state plan, Minn.Stat. § 62E.11, subd. 5. A contributing member is an insurer paying premium taxes, Minn.Stat. §§ 62E.02 subd. 23, 60A.15, which does not include Blue Cross-Blue Shield, self insureds or Health Maintenance organizations. It is this classification of those who must share the losses which the magistrate found to be violative of the equal protection clause. But we find the classification a proper one.

The contributing member may offset assessments paid to the association against its income and premium tax liability. Minn. Stat. § 62E.11, subd. 8.[3] In reviewing economic legislation,

> . . . it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

City of New Orleans v. Dukes, 427 U.S. 297, 304–05, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). The purpose of the classification between contributing and non-contributing members is to permit losses to be passed on to the taxpayers through the premium and income tax offset provisions. The legislative classification is therefore simply a means to pass on the cost of insuring the uninsurable to the taxpayer without levying a direct tax, and as such is rationally related to a legitimate state interest. Id. at 304, 96 S.Ct. at 2517.

The tax offset provisions were to expire in July 1981, but the expiration period was repealed prior to oral argument. 1980 Minn. Laws, Ch. 565 (April 14, 1980). The court will not "anticipate a question of constitutional law in advance of the necessity of deciding it," Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandis, J. concurring), and therefore does not consider the validity of the equal protection claim on the assumption that the tax offset provisions may someday be repealed.

### 3. Commerce Clause

■ The magistrate held that the conversion privileges of the Accident & Health Insurance Act, Minn.Stat. § 62A.01 et seq., created an unconstitutional burden on interstate commerce by imposing Minnesota statutory requirements on non-resident employees thereby interfering with other

---

**3.** The premium and income tax offset provisions were added in 1979, after the trial. The equal protection claim was therefore neither raised in the pleadings nor litigated at trial. The parties, however, submitted to the magistrate post trial memoranda on the offset provisions and have requested the court to rule on the equal protection claim. Because the claim is primarily a question of law which has been extensively briefed, for purposes of permitting review on appeal the court will consider the claim as though the pleadings were amended accordingly. Henry v. Coahoma County Board of Education, 246 F.Supp. 517 (N.D.Miss.1963) aff'd, 353 F.2d 646 (5th Cir. 1965).

states' insurance laws. The conversion privileges, simply put, permit one insured under a group policy to convert that coverage to an individual policy upon termination with the group. Minnesota Statutes § 62A.16 provides, *inter alia*,

> The provisions of sections 62A.16 and 62A.17 shall apply to all group insurance policies . . . providing coverage for hospital or medical expenses incurred by a Minnesota resident employed within this state.

Minn.Stat. § 62A.17, subd. 1 permits every employee to continue his coverage for up to six months after termination of employment; subdivision 6 gives the former employee the right to convert the policy into an individual policy. The Comprehensive Health Insurance Act has a similar provision, section 62E.16 which provides, *inter alia*, that

> [e]very . . . policy of group accident and health insurance or contract . . . written or renewed in this state, shall include, in addition to the provisions required by section 62A.17, the right to convert to an individual coverage . . . without the addition of underwriting restrictions if the individual insured leaves the group.[4]

The McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, was intended to free state's power to tax and regulate the insurance industry from the limitations imposed by the commerce clause. The avowed purpose of the McCarran-Ferguson Act was to preserve state regulation of insurance as it existed prior to *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). H.R.Rep.No. 143, 79th Cong. 1st Sess. p. 3 (1945). Prior to *South-Eastern Underwriters*, the primary federal limitation on state insurance regulation was the due process

clause and such regulation was not assailable under the commerce clause because the business of insurance was not considered interstate commerce. Minn.Stat. §§ 62A.17 and 62E.16 do not therefore violate the commerce clause. *See, e. g., Group Life & Health Insurance v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 1076 n. 18, 59 L.Ed.2d 261 (1979) ("The McCarran-Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack.") (dictum) *State Board of Insurance v. Todd Shipyards Corporation*, 370 U.S. 451, 452, 82 S.Ct. 1380, 1381, 8 L.Ed.2d 620 (1962) (striking taxation legislation on due process rather than commerce clause grounds, noting that ". . . the McCarran-Ferguson Act [citations omitted] . . . provided that the regulation and taxation of insurance should be left to the States, without restriction by reason of the Commerce Clause."). *Wadsworth v. Whaland*, 562 F.2d 70, 79 (1st Cir. 1977) (alternative holding, relying on *Todd, supra*, for the proposition that the states' regulation of the insurance business is not restricted by the commerce clause); *Accord, People v. United National Life Insurance Co.*, 66 Cal.2d 577, 58 Cal.Rptr. 599, 427 P.2d 199, 203 (1967).

Furthermore, the evidence indicates that insurance companies and employers with multistate group policies are regularly faced with meeting varying state requirements, and that the insurers can do so by merely attaching a rider or an endorsement which limits certain coverages to specific states. The conversion provisions then neither impose Minnesota statutory requirements upon non resident employees, nor interfere with foreign states' regulation of insurance. This is not protectionist regulation aimed at favoring local accident and health insurers over out of state insurers. *Cf. Hughes v. Oklahoma*, 441 U.S. 322, 99

---

4. The magistrate concluded that § 62E.16 either conflicted with § 62A.16 or was redundant. He therefore considered only § 62A.16 and held that conversion provision to violate the commerce and due process clauses. The conversion provisions of §§ 62A.16 and 62E.16 are different in scope: § 62E.16 applies only to policies written or renewed in Minnesota whereas § 62A.16 applies to all policies regardless of where they were written or renewed; and § 62E.16 covers all group policies, whereas § 62A.16 governs only those group policies covering resident employees. The sections are therefore not subject to attack on grounds that they are inconsistent or redundant.

S.Ct. 1727, 60 L.Ed.2d 250 (1979) (Oklahoma statute prohibiting transportation of minnows out of state struck as protectionist legislation in violation of commerce clause), and since the statute can be complied with by attaching appropriate riders or endorsements, the burden here is not "clearly excessive in relation to the putative local benefits." *Raymond Motor Transportation Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978).

Plaintiffs urged and the magistrate held that Minn.Stat. § 62A.16 violated the due process clause by attempting to extend Minnesota law to insurance contracts regardless of where they were written. Section 62A.16 applies only to policies covering resident employees and since the coverage can be afforded by riders, attachments or endorsements, the effect of the statute can be limited to resident employees. Moreover, all plaintiffs in this action are licensed to do business in this state. Under these circumstances the court does not view the location of where the contract is written as determinative. In this case the premiums are paid,[5] proceeds received, claims investigated and disputes litigated in Minnesota. Furthermore, the insured is located in Minnesota and since the subject of this regulation is accident and health insurance, the state of Minnesota has a greater interest at stake than it would have if only property insurance were involved.

Those contacts and interests are sufficient to permit Minnesota to impose its laws regardless of where the contract is written. *See e. g. Clay v. Sun Insurance Office Ltd.,* 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964) (location of insured property in state was sufficient contact to apply Florida statute which modified limitation term in insurance contract.); *Watson v. Employers Liability Assurance Corporation,* 348 U.S. 66,

75 S.Ct. 166, 99 L.Ed. 74 (1954) (location of injured in state sufficient contacts to apply Louisiana direct action statute which applied "whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not . . . ." *Id.* at 68 n. 4, 75 S.Ct. at 168 n. 4); *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943) (statute subjecting reciprocal insurers to New York law upheld on due process grounds where only contacts were situs of insured property, and situs where risks were investigated.); *People v. United National Life Insurance Co.,* 66 Cal.2d 577, 58 Cal.Rptr. 599, 427 P.2d 199 (1967) (statute subjecting accident and health insurers to California law where only contact was mail solicitation and location of putative insured, upheld against due process attack). *Accord, Ministers Life and Casualty Union v. Haase,* 30 Wisc.2d 339, 141 N.W.2d 287 *appeal dismissed* 385 U.S. 205, 87 S.Ct. 407, 17 L.Ed.2d 301 (1966) *rehearing denied* 385 U.S. 1033, 87 S.Ct. 739, 17 L.Ed.2d 681 (1967) (appeal was dismissed for want of substantial federal question).

The court should not decide a constitutional question except with respect to the particular facts before it, *Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1390, 89 L.Ed. 1725 (1945), and therefore declines to rule on the hypothetical facts purported by plaintiffs.

**4. Other Issues**

The Act requires that persons eligible for state plan coverage show evidence of prior rejection or a rate up the effect of which is to reduce their coverage from that received by standard risk insureds;[6] and delegates to the commissioner authority to promulgate rules ". . . not inconsistent with this chapter and which evidence that a person is unable to obtain coverage substantially similar to that . . .

5. The statute applies only to residents employed in this state, thus if the employer is viewed as the insured, the premiums are payable out of his activities in this state. On the other hand, since group insurance is a benefit given employees as part of their wages, the premiums, though formally paid by the employer, are in effect paid by the employees. *Anti-*

nora v. *Nationwide Life Insurance Co.,* 350 N.Y.S.2d 863, 870, 76 Misc.2d 599 (1973).

6. The "rejection" or "rate up" requirement of § 62E.14, subd. 1(c) is an eligibility requirement. Any other interpretation would be inconsistent with the plural of requirements in § 62E.02, subd. 13.

obtained by a person who is considered a standard risk." Minn.Stat. § 62E.14. Plaintiffs urge and the magistrate found that the Commissioner's rule-making authority violated the non-delegation doctrine.

■ The delegation of legislative authority will be upheld if appropriate standards to guide the agency are set forth in the statute. *National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974); *City of Richfield v. Local No. 1215, International Ass'n of Fire Fighters*, 276 N.W.2d 42 (Minn.1979). In this case the requirements that the rules be consistent with the statute and provide that the person is a high risk or uninsurable are sufficient guidelines to avoid arbitrary agency action. *See State of Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (requirement that regulations respect present perfected rights and further the general purpose of Act, which was to apportion water in the best interests of the basin states and welfare of the nation, upheld.)

The state plan eligibility provisions are sufficiently clear to support and give effect to the statute. *Insurers Action Council, Inc. v. Heaton*, 423 F.Supp. 921, 925 (D.Minn.1976), and therefore do not render the statute unconstitutionally vague.

■ The magistrate further recommended that the Act be declared unconstitutional on grounds that it violated the contract clause, U.S.Const. art. 1, § 10.[7] The statute merely requires that all accident and health insurers *offer* major medical coverage to persons renewing or purchasing unqualified plan coverage. Minn. Stat. § 62E.04, subd. 4. The offer "may consist of the offer of a rider on an existing

unqualified policy or a new policy which is a qualified plan." *Id.* In offering major medical the insurer can apply its own underwriting standards, Minn.Stat. § 62E.04, subd. 7, and may charge a premium commensurate with the risk assumed. If the insurer elects not to comply with the Act, it must stop selling accident and health insurance in the state.

The statute does not require the insurer to include the new coverage in the outstanding policies as was the case in *Health Insurance Ass'n of America v. Harnett*, 44 N.Y.2d 302, 405 N.Y.S.2d 634, 376 N.E.2d 1280 (1978)[8] nor does it require the insurer to offer the major medical coverage at its own expense. Thus, the contractual obligations of either party are altered only if there is an arms length renegotiation of the terms of the contract. The statute imposes on the insurer only the duty to initiate that renegotiation.

■ The contract clause prohibits only significant legislative alterations of existing obligations; it was designed to bring certainty to and restore confidence in the contractual undertakings of man. *Sturges v. Crowninshield*, 17 U.S. 122, (4 Wheat.), 4 L.Ed. 529 (1819) (Marshall, Ch. J.). In this case there is no term or obligation of an existing contract which has been altered. The insurer is simply required to offer the new coverage on its own terms which the insured may accept or reject. The parties have precisely that for which they bargained; there is no upsetting of contractual expectations. This legislation, therefore, does not impinge upon any interests the contract clause was intended to protect.

7. The impairment of contract claim is based on the effect of the major medical provision, Minn. Stat. §§ 62E.04, subd. 4, on non-terminable insurance contracts. There are three types of non-terminable policies: 1. non-cancelable, where the insurer cannot increase the premiums, change the terms or terminate without consent of the insured; 2. guaranteed renewal, where the insurer cannot terminate without the consent of the insured but may increase premiums, if it does so on a classwide basis; and 3. non-renewal for stated reasons only, where the insurer can terminate or increase the premiums without consent of the insured, provided it does so on a classwide basis.

8. The Act previously required the insurer to include major medical; it was amended in 1977, after this case was last before the court. This court's previous reflections on the contract clause issue are therefore not relevant here.

Plaintiffs argue that an insurer choosing not to comply with the statute must stop selling insurance in the state and therefore breach its contractual obligations on outstanding non-cancelable and guaranteed renewal contracts. The argument assumes that an insurer cannot continue to renew policies in this state after it has stopped doing business in this state. But this is an unjustified assumption. Since an insured has a contractual right to renew non-cancelable and guaranteed renewal policies, permitting the insurer to renew those types of policies merely authorizes an insurance company to honor contractual obligations under outstanding contracts. An *insured* may enforce its rights under a policy even though the *insurer* is no longer licensed to do business in the state. Minn.Stat. § 72A.41, subd. 3. *See also, American Mutual Services Corp. v. United States Liability Insurance Co.,* 293 F.Supp. 1082 (E.D.N.Y.1968); *Ganser v. Fireman's Fund Insurance Co.,* 34 Minn. 372, 25 N.W. 943 (1885).[9]

The court has considered other arguments urged by plaintiffs but finds them without merit. We declare the challenged statutes to be a valid exercise of legislative authority within the Constitution and direct the clerk to enter judgment for defendants.

---

**9.** Minn.Stat. § 72A.41 makes it unlawful for an insurance company to transact business without a certificate of authority. "Transaction of business," includes "The collection of a premium," . . . or (d) the transaction of any matter subsequent to the execution of [an insurance] contract . . .") *Id.* at subd. 2. Subdivision 3 provides that the "failure . . to obtain a certificate of authority shall not impair the validity of any act or contract of such company . . ." Honoring its obligations under outstanding insurance contracts, after its certificate of authority has been suspended, can therefore not be deemed to be the illegal transaction of insurance business. *See also,* Minn.Stat. § 60A.05, after revocation or suspension of a foreign insurer's certificate of authority "no *new* business shall thereafter be done by it . . . ." (emphasis added.)