**AMERICAN COUNCIL OF LIFE INSURANCE, et al., Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civ. A. No. 86–2131.

United States District Court, District of Columbia.

Sept. 19, 1986.

Richard J.M. Poulson, Peter W. Tredick, John C. Keeney, Jr., John C. Roberts, Jr., Randall D. Eliason, Hogan & Hartson, Washington, D.C., for plaintiffs.

Kathleen A. Carey, Asst. Corp. Counsel, D.C., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

American Council of Life Insurance (ACLI) filed this suit seeking a declaratory judgment that the "Prohibition of Discrimination in the Provision of Insurance Act of 1986" enacted by the District of Columbia Council is unconstitutional under the Fifth Amendment and violates the District of Columbia Self-Government and Governmental Reorganization Act, D.C. Code §§ 1–204 and 1–233(a)(3) (1981). Plaintiffs have moved for summary judgment and for a preliminary injunction. Defendants have moved to dismiss this action or in the alternative for summary judgment.

Upon consideration of the oral arguments and the numerous memoranda filed in this action, the Court finds the statute constitutional and shall grant summary judgment for the defendants.

### Background

The "Prohibition of Discrimination in the Provision of Insurance Act of 1986" (hereinafter "the Act" or "D.C. Act") prohibits health, life and disability insurers from discriminating against individuals on the basis of any test screening for AIDS, ARC, or HTLV–III infection and from denying benefits because the individual develops AIDS, ARC or HTLV–III infection. D.C. Act 6–170. Under the Act "an insurer may not deny, cancel, or refuse to renew insurance coverage, or alter benefits covered or expenses reimbursable, because an individual has tested positive on any test to screen for the presence of any probable causative agent of AIDS, ARC, or HTLV–III infection ... [nor] because an individual has declined to take such a test." D.C. Act 6–170, § 4. Insurers, however, may exclude from coverage applicants diagnosed as having AIDS (acquired immune deficiency syndrome). D.C. Act 6–170, § 6.

The Act imposes a five year moratorium on the use of AIDS screening tests for the purposes of adjusting rates, premiums, dues or assessments. Five years from the date of the Act, insurance companies may seek permission from the Superintendent of Insurance to increase premiums and rates for individuals who test positive for exposure to the probable causative agent of AIDS. D.C. Act 6–170, § 5(b)(1). Before permission is granted, the District of Columbia Commissioner of Public Health must first determine that the test the insurance company proposes to use is reliable and accurate. D.C. Act 6–170, § 5(b)(2).

A report by the D.C. Council states the premises on which the bill was based:

First, there is as yet no test of proven reliability and accuracy for identifying exposure to the probable causative agent of AIDS. And,

Second, assuming that a reliable and accurate test will be developed at some point, there is no body of evidence to show its value as a predictor of who will or will not develop AIDS....

D.C. Council Rpt. at 2 (April 22, 1986). During consideration of this Act the D.C. Council heard from thirty witnesses representing the insurance industry, medical profession and gay community on the advisability and fallibility of passing this law. Def. S.J. Motion Exhs. 1–7.

Insurance companies, for example, presented evidence on the reliability of the AIDS screening tests and predicted that large increases in individual premiums would result if the bill were passed. Def. S.J. Motion Exh. 2. Doctors expressed concern that without the protection of the Act many individuals in the at-risk category would avoid AIDS tests and not seek counseling, both of which are crucial to the AIDS Public Health Program. Def. S.J. Exh. 2.

The Act provides for criminal penalties and civil private causes of action. D.C. Act 6–170 § 9. The Congressional veto period ended without reversal by Congress and the Act became effective on August 7, 1986.

### Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, such that movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Supreme Court recently clarified the role of summary judgment in litigation, stating:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, courts must approach summary judgment motions with an even hand, evaluating all concrete evidence provided, and drawing all inferences in favor of the party opposing the motion.

### Fifth Amendment Due Process Claim

Judicial review of economic regulation begins with the premise that "legislative Acts adjusting the burdens and benefits of economic life come ... with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). To pass constitutional muster, the D.C. Act must rationally relate to a legitimate government purpose. *See, e.g., Gray Panthers v. Administrator, Health Care Financing Administration,* 566 F.Supp. 889, 892 (D.D.C.1983). As a preliminary matter, under the rational basis test the D.C. Council clearly has a legitimate interest in regulating the insurance industry. *See e.g. California Automobile State Asso. v. Maloney,* 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951). The D.C. Act moreover is protected by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), to the extent that "the McCarran-Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 218 n. 18, 99 S.Ct. 1067, 1077 n. 18, 59 L.Ed.2d 261 (1979). The dispute arises, however, over whether the D.C. Council acted in an irrational and arbitrary fashion in enacting a law prohibiting insurers from screening applicants for exposure to AIDS and from raising rates reasonably commensurate with the increased insurance risks.

Plaintiffs argue that the goal of the D.C. Council is to prevent discrimination against individuals who test positive for AIDS virus but might not develop AIDS. Plaintiffs contend that the "use of the [screening] tests for standard insurance purposes" is nondiscriminatory and, therefore, the statute "bear[s] no rational relation to its purposes." Pltf. S.J. Mem. at 9. The Act, according to the defendants, aims to prevent "unjustified discrimination against citizens of the District of Columbia and [to] fulfill the public need to promote the availability of broad insurance coverage." Def. S.J. Mem. at 4. Defendants argue that the AIDS tests are neither accurate nor reliable and that, therefore, some individuals will be unjustly denied insurance.

Plaintiffs contend that insurance companies do not behave in a discriminatory manner when they categorize individuals according to group traits or characteristics. Insurance companies base decisions on the risk and not the certainty that an illness or death will occur. Plaintiffs analogize AIDS screening tests to the tests routinely given by insurance companies to determine if an individual suffers from high blood pressure or coronary heart disease. Plaintiffs further note that statutory prohibitions against sickle cell anemia differ from the D.C. statute because sickle cell anemia does not significantly increase risk of mortality. Individuals who test positive for the AIDS virus, though, have a twenty-six times greater chance of early death.

■ Plaintiffs offer persuasive evidence that the tests accurately target a group of individuals with significantly higher risks. Plaintiffs note, for example, that two ELISA tests followed by a Western blot test are 99.9 percent reliable in determining whether someone has been exposed to AIDS. Plaintiffs, though, presented evidence to this Court that was not available to the D.C. Council at the time the bill was under consideration. The Centers for Disease Control, for example, recently concluded that "[f]or public health purposes, patients with repeatedly reactive screening tests for HTVL–III/LAV antibody ... in whom antibody is also identified by the use of supplemental tests ... should be considered both infected and infective." Morbidity and Mortality Weekly Report 305 (Vol. 35/No. 20, May 23, 1986) (cited in Plaintiffs' Reply). This summer the Wisconsin State Epidemiologist concluded that two positive ELISA tests followed by a Western blot test are "medically significant and sufficiently reliable for the presence of antibody to human T-lymphotropic virus type III." [1] Plaintiffs argue that the Wisconsin report demonstrates that the D.C. Council erred in enacting a complete ban on testing. Although the Court agrees that in light of this evidence the D.C. Council should be encouraged to reconsider its decision, this report was not before the Council last spring and therefore cannot prove the irrationality of the law.

Plaintiffs attempt to further demonstrate the arbitrariness of the District of Columbia law, however, by contrasting the Act to California and Maine statutes. California prohibits the use of certain blood tests to determine AIDS susceptibility but does not prohibit insurers from using T–Cell tests, unlike the District of Columbia law which bans any test. Cal. H & S Code § 199.21(f)

(Deering 1986). Maine's statute merely prevents insurers from inquiring of the applicant whether the individual has taken a test for the AIDS virus. Pub. L. 711 (April 16, 1986). Although the District of Columbia statute is far more comprehensive in the restrictions it imposes, it cannot be deemed unconstitutional merely because the D.C. Council chose to enact a stronger regulation.

The Court should look to the express language of the Act and to the legislative history in determining whether any rational basis exists. This Circuit has held that

A court should not assume that the articulated objectives of a statute are its only objectives. If a classification cannot be sustained in light of the statute's articulated purpose, a court may sustain the classification if it rationally furthers other legitimate state interests.

*Dimond v. District of Columbia*, 792 F.2d 179, 186 (D.C.Cir.1986). While much of the testimony presented to the D.C. Council questioned the accuracy and reliability of the tests, witnesses also expressed concern about false test results, the exorbitant costs of treating AIDS victims, and the need to ensure access to care and treatment. Physicians testified about potential positive effects the law would have on the AIDS Public Health Program. This evidence considered by the D.C. Council leads to a finding that there was a rational basis for the law.

The Court finds the moratorium on rate increases, however, the most troublesome aspect of the law. Plaintiffs argue that insurance premiums will increase dramatically to cover the costs of insuring individuals exposed to the AIDS virus.[2] The District of Columbia law appears to have the effect of shifting the cost of AIDS to new-

---

**1.** Serologic Tests for the Presence of Antibody to Human T-Lymphotropic Virus Type III: Information Pursuant to the Purposes of Wisconsin Statute S. 631.90 Regarding their Use in Underwriting Individual Life, Accident and Health Insurance Policies at 22 (July 28, 1986). The D.C. Council modeled its statute after the Wisconsin law which permits insurance companies to require testing for AIDS if the State Epidemiologist finds the proposed test to be reliable.

**2.** Plaintiffs estimate that cost of AIDS is thirteen times greater for a group of one hundred males aged thirty to thirty-four who have tested positive for exposure to AIDS virus than a group of one hundred standard rated males. Pltf. Complaint ¶ 19.

ly-issued individual insurance policies and to the insurance companies as the statute forbids even reasonable rate increases to reflect the increased risks associated with exposure to AIDS. Some insurers have already ceased doing business in the District of Columbia. The Wisconsin legislature in enacting a similar law may have followed a wiser course of action by providing an escape clause to allow rate increases and by establishing a pool to help fund the health care needs of AIDS victims, thereby shouldering some of the responsibility. 1985 Wisc. Act 73, §§ 4 and 6. The nature of the rapidly changing landscape of AIDS research suggests that the D.C. Council may have acted too hastily in imposing the five year moratorium on rate increases. The D.C. Council, though, considered and accepted the possibility that premiums would increase, and that some of their constituents might therefore be unable to obtain or afford insurance coverage.

■ Although this Court questions the wisdom of the District of Columbia law as drafted, it cannot find that a rational basis does not exist to support it. It is a basic principle of constitutional analysis that "a belief that an Act ... may be inequitable or unwise is of course an insufficient basis on which to conclude that it is unconstitutional." *Schweiker v. Hogan,* 457 U.S. 569, 589, 102 S.Ct. 2597, 2609, 73 L.Ed.2d 227 (1982). Courts, moreover, "are not empowered to second-guess the wisdom of state policies" but must confine review "to the *legitimacy* of the purpose." *Western and Southern Life Insurance Co. v. State Board of Equalization of California,* 451 U.S. 648, 670, 101 S.Ct. 2070, 2084, 68 L.Ed.2d 514 (1981) (citing *Ferguson v. Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963)). The D.C. Council enacted this statute after extensive hearings on its advisability and consequences. The D.C. Council intended to address the serious problem of securing insurance coverage for individuals suscepti-

ble to the AIDS virus. *See Insurers' Action Council, Inc. v. Markman,* 490 F.Supp. 921, 924–25 (D.Minn.1980) (insurance act's mandatory provision to offer major medical coverage rationally related to "assuring the availability of adequate health care coverage to all residents"). Given the evidence before the Council on the reliability of the screening tests and the medical testimony about the need to ensure access to care and treatment, this Court finds that the D.C. Council had a rational basis for the law.

Although the Court agrees with plaintiffs that new evidence on the accuracy of AIDS tests for insurance purposes and the everchanging breakthroughs in AIDS research raise serious questions about imposing a five year ban on screening applicants for AIDS or increasing insurance rates of individuals testing positive for exposure to AIDS,[3] the Court finds that the District of Columbia statute is constitutional under the Fifth Amendment.

### *Extraterritorial Reach*

Plaintiffs argue that the insurance law regulates insurance practices outside of the District of Columbia and therefore violates the District of Columbia Self-Government and Governmental Reorganization Act (hereinafter D.C. Self-Government Act). D.C.Code §§ 1–204, 1–233(a)(3). The D.C. Self-Government Act prohibits the District of Columbia government from passing legislation whose "application is not restricted exclusively to the District.". D.C. Code § 1–233(a)(3). The insurance Act on its face could subject out-of-state insurance companies doing business in the District of Columbia to penalties if the companies discriminate against individuals exposed to AIDS.

Defendants admit that the language of the Act is somewhat ambiguous as to its reach but contend that under simple statutory construction the Act applies "within"

---

**3.** *See Insurers' Action Council, Inc. v. Markman,* 653 F.2d 344, 346 (8th Cir.1981) (upholding insurance law requiring each insurer to offer major medical coverage to every applicant in view that the "insurer is required only to *offer* the coverage and ... the insurer may apply its own underwriting standards, charging a premium commensurate with the risk").

the District of Columbia. The legislative history indicates that the statute would only apply when the company was doing business in the District of Columbia. The D.C. Council's Report, Section-by-Section Analysis states:

> the definition [of insurer] is written broadly enough to encompass all those engaged in the business of health, disability and life insurance in the District, thus *applying the requirements of the act to all individual and group policies or contracts issued, amended or renewed in the District.*

(Emphasis added) (April 22, 1986) at 14. In hearings before Congress, two Council members stated that the Act was only meant to affect insurance companies *when* doing business in the District of Columbia. Plaintiffs admit that the legislative intent was that the Act would have no extra-territorial application but argue that under the plain meaning of the statute it is in violation of the D.C. Self-Government Act.

Plaintiffs further argue that the District of Columbia is attempting to regulate insurance practices in other states in violation of the Fifth Amendment. The Supreme Court held in *Aetna Life Insurance Co. v. Dunken,* 266 U.S. 389, 399, 45 S.Ct. 129, 132, 69 L.Ed. 342 (1924), that a Texas insurance statute was unconstitutional if it regulated business outside of Texas and controlled contracts made by citizens of other states.

Although the statutory language of the Act itself is broad, the legislative history clearly indicates that the D.C. Council intended the statute to apply only when insurance companies are doing business in the District of Columbia.[4] This Circuit has held that "in deciding among possible interpretations of a statute, the court must select an interpretation that appears to be consistent with the statute's constitutionality." *International Union, et al. v. National Right to Work Legal Defense and Education Foundation, Inc.,* 590 F.2d 1139, 1148 (D.C.Cir.1979), *aff'd* 781 F.2d 928 (D.C.Cir.1986); *see e.g. United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). Therefore, to avoid reaching the constitutional issue, this Court finds that the D.C. Act can be read as applying only when insurance companies are doing business in the District of Columbia.[5]

Accordingly, for the reasons set forth above, it is this 19th day of September, 1986,

ORDERED that plaintiffs' motion for summary judgment is hereby denied; and it is

FURTHER ORDERED that defendants' motion for summary judgment is hereby granted, judgment is hereby entered for defendants, and this matter is hereby dismissed.

---

**4.** If plaintiffs were before the Court because of an actual extraterritorial application of the Act, that would raise different issues and concerns.

**5.** The Court deems it unnecessary to reach the preliminary injunction motion raised by plaintiffs given the Court's holding that the D.C. Act is constitutional.